FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

98 OCT 16 PM 3: 52

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| CAROLYN THOMPSON, et al., | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV 97-N-2776-S |
| | ] | |
| BOARD OF EDUCATION OF | ] | |
| TUSCALOOSA COUNTY, | ] | |
| ALABAMA, et al., | ] | |
| | ] | |
| Defendant(s). | ] | |

ENTERED

OCT 1 6 1998

### MEMORANDUM OF OPINION

#### I.     INTRODUCTION: THE PARTIES.

The plaintiff, Carolyn Thompson ("Thompson"), brings this action on behalf of herself and her minor child, Kim Story ("Story"), pursuant to 42 U.S.C. § 1983 ("section 1983") and the statutory and common law of Alabama. In order to assist in understanding the somewhat convoluted facts, the court provides the following summary of who the plaintiffs and defendants are and what roles they played.

**The Plaintiffs**

*Story*: Kim Story, a student at Hillcrest Middle School, who was allegedly strip searched and otherwise humiliated and harassed by the defendants

*Thompson*: Story's mother

### The Individual Defendants

All of the individual defendants are sued in their individual and official capacities.[1]

*Melendez*: Rick Melendez, Assistant Principal of Story's school, who participated in the investigation of Kim and allegedly authorized the search

*Cain*: Jim Cain, Principal of the school, who also participated in the investigation of Kim

*Walters*: Cynthia Walters ("Walters"), an employee at the school who participated in the search

*Everett*: Toni Everett, a law enforcement officer employed by the City of Tuscaloosa, Alabama, who conducted the search

*Sexton*: Ted Sexton, Sheriff of Tuscaloosa County, Alabama, who was allegedly responsible, along with the City of Tuscaloosa, for supervising Everett

*Sellers*: Joyce Sellers, Superintendent of the Tuscaloosa County Board of Education, which oversees Story's school and employs Cain, Melendez, and Walters

*Merrill*: John Merrill, an employee of the Board, who serves as its spokesperson

*The Board Members*: Frankie Thomas, Rick Harbin, Morris Acker, Pam Garner, Tom Myers, R. Manly Neighbors, and Dot Smith, each of whom are members of the Board

---

[1] Though the plaintiffs were specifically ordered to do so in the Court's Order entered December 8, 1997, the plaintiffs failed to allege in *separate* counts in their amended complaint the individual capacity claims vs. the official capacity claims they may have against any defendant. Instead, the plaintiffs merely assert at the beginning of the complaint in a section describing the parties to the action that each defendant is sued in his or her individual and official capacities, without delineating which facts, if any, support each such claim against each such defendant. For the purposes of the motions to dismiss, the court will assume that in the plaintiffs' "shotgun complaint," they are asserting both individual capacity and official capacity claims against these defendants.

2

**ENTITY DEFENDANTS**

*The Board:* The Board of Education of Tuscaloosa County, Alabama, which oversees Story's school and employs Cain, Melendez, and Walters

*The City:* The City of Tuscaloosa, which employs Everett and is apparently responsible, along with Sexton, for her training and supervision

*The Sheriff:* Ted Sexton, Sheriff of Tuscaloosa County, Alabama, sued in his official capacity as holder of the office of sheriff.

The matter is currently before the court on motions to dismiss, filed by defendants Melendez, Cain, and Walters on November 11, 1997; defendant Tuscaloosa County Board of Education on November 19, 1997; defendant Sexton on December 3, 1997; defendant Everett on December 15, 1997; and defendants Sellers, Thomas, Harbin, Acker, Garner, Meyers, Neighbors, Smith, and Merrill, on January 9, 1998, respectively.

Pursuant to the court's order entered December 5, 1997, the plaintiffs amended their complaint on December 11, 1997. Subsequent to this amendment, the defendants' motions to dismiss were briefed by all parties and are currently ripe for decision. Upon due consideration, the motions will be granted in part and denied in part.

## II. ALLEGATIONS OF THE COMPLAINT.

### A. The Events.

The plaintiffs allege that on September 10, 1997, Miss Story was an eighth grade student at Hillcrest Middle School and that, on that date, as fourth period was beginning, another student reported to school officials that ten dollars ($10.00) had been lost or stolen from her and accused Miss Story of having taken the money. *Complaint* ¶¶ 15-16. Another

3

student was then questioned regarding the alleged theft and, based upon such information as may have been provided by the students, Miss Story was summoned from her classroom and directed to report to the principal's office. *Complaint* ¶ 17.

Upon arriving at the principal's office, Miss Story was questioned by defendant Melendez, assistant principal, who asked her whether she had taken the student's money. When Miss Story responded that she had not, Mr. Melendez repeated the question and received the same response. *Complaint* ¶ 18. The plaintiffs aver that the school's principal, defendant Cain, arrived and asked Miss Story whether she had any money on her person, to which she replied that she had one dollar, and produced it for the school officials. *Complaint* ¶ 19. Defendant Walters, a female official at the middle school, was present during these events.

Thereafter, defendant Melendez allegedly contacted defendant Everett, a law enforcement officer for the City of Tuscaloosa, Alabama, specializing as a Juvenile Division Investigator, *Complaint* ¶10, for the purpose of conducting further interrogation of Miss Story. *Complaint* ¶ 21.

The plaintiffs contend that Miss Story asked if she would be permitted to contact her mother, one of the plaintiffs here, who was then at home and could be reached by phone. *Complaint* ¶ 23. Miss Story was allegedly told that she could not and that the school officials, specifically defendant Melendez, would contact Ms. Thompson. Mr. Melendez did not contact Ms. Thompson and Miss Story was never permitted to contact her mother during these events. *Complaint* ¶ 23. The plaintiffs claim that defendant Melendez's failure

4

to do so was a violation of existing school policy. *Id.* The relevant portion of the Board's

policy, quoted in the complaint, provides:

> INTERROGATIONS BY LAW ENFORCEMENT OFFICIALS AT
> THE REQUEST OF SCHOOL OFFICIALS
>
> When the principal or his or her designee has evidence and/or
> reasonable cause to believe that a crime has been committed
> on-campus by one or more students, law enforcement officials,
> to include juvenile authorities, may be requested to come to
> the school to investigate the incident.
>
> Such investigations may include interrogation of students. In
> the event a student is to be interrogated about a crime
> committed on-campus, the law enforcement official must read
> the *Miranda* rights pertaining to the student being interviewed.
> The juvenile *Miranda* rights are distinguished from the adult
> *Miranda* rights based on the student's right to contact a parent
> or guardian through the provided reasonable means. The
> decision to contact a parent or guardian is solely up to the
> student to be interviewed. A waiver of the *Miranda* rights is
> available to the student who agrees to an immediate interview.

*Policy or Declaration of Tuscaloosa Bd. of Educ. as alleged in Plaintiffs' Complaint,* ¶ 70.

Shortly thereafter, the plaintiffs allege that she was subjected to a strip search in

which defendant Everett physically touched her naked body in order to determine whether

there was anything concealed by Miss Story. *Complaint* ¶ 25. After the search, and failing

to locate the missing ten dollars, Miss Story was released to return to class. *Complaint* ¶

28.

The plaintiffs allege that at the time defendants Everett and Walters ordered Miss

Story to remove her clothing, neither defendant Cain, Melendez, Walters nor Everett had

any reasonable basis upon which to suspect that Miss Story had engaged in any illegal

5

activity, *Complaint* ¶ 29, and that even if such reasonable suspicion existed, the intrusive nature of the search was not justified. *Complaint* ¶ 30.

Plaintiffs also claim that after the search the defendants engaged in a hurtful campaign of media "damage control;" *Complaint* ¶¶ 35-41. Defendants Cain, Melendez, and Sexton allegedly interrogated students at the middle school after the search, requiring such students to speak into recording devices and requiring them to execute signed statements, *Complaint* ¶ 35. Defendant Sexton published in the September 18, 1997 *Tuscaloosa News* a response to the allegations made by Miss Story and her mother after the strip search, wherein defendant Sexton allegedly made reference to an arson case about which he had dealt with "this family before." *Complaint* ¶ 36. Defendants Sexton and Merrill informed the news media that during the search it was noted that Miss Story "wore no underwear," which was an allegedly false statement. *Complaint* ¶ 37. The plaintiffs aver that such actions and statements made by these defendants subjected Miss Story to humiliation and ridicule beyond that to which she was subjected during the strip search itself. *Complaint* ¶ 38.

The plaintiffs further contend that, one week after the strip search incident, defendant Sexton contacted various members of the news media and engaged them in conversation about Miss Story, *Complaint* ¶ 74, and intentionally disclosed to them the contents of a juvenile court file concerning Miss Story, despite his knowledge that such disclosure was illegal under the privacy rights of Miss Story, and under state statutes relating to the dissemination of juvenile court records.

6

**B. The Claims.**

In Count I, the plaintiffs allege that defendants Cain, Melendez, and Walters, working in concert with defendant Everett, intentionally deprived Miss Story, a minor, of rights, privileges and immunities secured to her by the Fourth and Fourteenth Amendments[2] to the United States Constitution by initiating and conducting a strip search, for which section 1983 allegedly provides a remedy. *Complaint* ¶ 33.

In Count II of their complaint, the plaintiffs assert that defendants Cain, Melendez, Everett, Sexton and Merrill intentionally deprived Miss Story of rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution by conducting their "damage control" campaign.[3]

In Count III of the complaint, the plaintiffs allege, pursuant to section 1983, that Miss Story has been deprived of rights, privileges and immunities secured by the Fourth and Fourteenth Amendments by the actions or inaction by defendants Board of Education of Tuscaloosa County; Joyce Sellers, the Superintendent of the Board; Frankie Thomas, Rick Harbin, Morris Acker, Pam Garner, Tom Myers, R. Manly Neighbors, and Dot Smith, each of whom are members of the Tuscaloosa County Board of Education. *Complaint* ¶¶ 42-53.

Specifically, the plaintiffs allege that the Board had no adequate written policy addressing searches and seizures and has adopted no such policy; *Complaint* ¶ 42; that

---

[2]As plaintiffs allege that a search was conducted without a reasonable basis, this is clearly a claim based on the Fourth Amendment's prohibition against unreasonable searches and seizures, applied to state actors via the Fourteenth Amendment.

[3]It is not clear exactly what right contained in these clauses of the constitution were allegedly violated by this conduct. *See infra* at page 46-47.

the Board, its members, and defendant Sellers, with deliberate indifference, failed to properly train, supervise, regulate, discipline or otherwise control their employees; and that their failure to promulgate proper guidelines for searching students, to properly train and discipline the individuals involved, and to properly investigate the incident at issue caused the constitutional injuries plaintiff suffered. *Complaint* ¶ 43. The plaintiffs further aver that any policies or procedures that did exist at the time the events giving rise to this cause of action took place were "vague and ambiguous," *Complaint* ¶ 48-51 and that the Board and its members knew or should have known that their failure or refusal to promulgate "suitable policies and procedures" was calculated to, or would necessarily result in the plaintiffs' "constitutional deprivations."[4] *Complaint* ¶ 49.

In Count IV, the plaintiffs claim that neither the City of Tuscaloosa nor defendant Sexton, as sheriff, had an "adequate written policy addressing searches and seizures of minor school-children [sic] and have . . . adopted no such policy," *Complaint* ¶ 56; that the City of Tuscaloosa and defendant Sexton, failed to properly train, supervise, regulate, discipline or otherwise control their employees, failed to properly investigate the incident giving rise to this cause of action, and failed to properly discipline the individuals involved herein. *Complaint* ¶ 57. Moreover, the plaintiffs contend that the City and defendant Sexton had an "affirmative obligation or duty" to promulgate appropriate rules, regulations, policies and procedures as would adequately guide the law enforcement officials in their employ, and that the absence of such policies and procedures resulted in "constitutional

---

[4] The plaintiffs in their complaint do not specify what "constitutional violations" took place here. The court assumes that plaintiffs are referring to the various constitutional claims made against these defendants' agents in prior counts.

8

violations"[5] against the plaintiffs. *Complaint* ¶¶ 58-66. The plaintiffs also aver generally that any existing policies or procedures applicable to the circumstances in this case were "vague and ambiguous" and resulted in the "improper delegation of final policymaking authority to defendant Everett." *Complaint* ¶ 61.

In Count V of the complaint, the plaintiffs aver that defendants Cain, Melendez, Walters and Everett violated the Board of Education's established policy concerning the plaintiff's privacy and property rights and concerning interrogations by law enforcement officials. *Complaint* ¶¶ 67-72. Specifically, the plaintiffs claim that these defendants violated the policy by failing or refusing to permit Miss Story to contact her parent, and by failing to apprise Miss Story of her constitutional rights prior to interrogation and the conduct of the strip search. *Complaint* ¶ 71. Based on these allegations the plaintiffs contend that their substantive and procedural due process rights were violated by defendants Cain, Melendez, Walters and Everett. *Complaint* ¶ 72.

In Count VI, the plaintiffs assert individual and official capacity claims against defendant Sexton under section 1983 based on Sexton's alleged disclosure of information from sealed juvenile court files. *Complaint* ¶ 73. Plaintiff alleges that Sexton made these disclosures despite his knowledge that they were illegal under the privacy rights of Miss Story, as allegedly guaranteed by the Fourteenth Amendment to the United States Constitution via section 1983. *Complaint* ¶¶ 76-83.

---

[5] *See* note 4 *supra.* Consistent with this understanding, toward the end of Count IV the plaintiffs aver that the acts and omissions by the City and defendant Sexton deprived them of their "rights, privileges and immunities secured to them under the Fourth and Fourteenth Amendments to the United States Constitution," *Complaint* ¶66, the same rights allegedly infringed by the individual defendants who conducted the search.

In Count VII, plaintiff Carolyn Thompson, for herself individually, asserts claims against defendants Cain, Melendez, Walters, and Everett for interference with the parent-child relationship and violations of privacy rights allegedly guaranteed by the Fourteenth Amendment to the United States Constitution via section 1983. *Complaint* ¶¶ 84-89.

In Count VIII, the plaintiffs assert the tort of outrage under Alabama law against defendants Cain, Melendez, Walters and Everett, on the basis of their conduct at the time of the strip search, and against defendants Sexton, Sellers and Merrill, "by their official and overreaching misconduct thereafter." *Complaint* ¶ 90. Also in Count VIII, the plaintiffs claim damages under the tort of outrage against defendant Board of Education, pursuant to the doctrine of *respondeat superior. Id.*

In Count IX, the plaintiffs aver that defendants Cain, Melendez, Walters, Everett, Sexton and Merrill, individually and in their official capacities, intentionally or negligently inflicted mental and emotional distress upon them in violation of Alabama law. *Complaint* ¶¶91-93. The plaintiffs further assert that the defendant Board of Education is liable pursuant to the doctrine of *respondeat superior. Complaint* ¶ 93.

In Count X of their complaint, the plaintiffs seek declaratory relief and allege that defendants Cain, Melendez, Walters and Everett, in conducting the strip search of Miss Story, violated her clearly established constitutional rights guaranteed by the Fourth and Fourteenth Amendment[8] to the United States Constitution, *Complaint* ¶¶ 94-95; and that

---

[8] The plaintiffs do not state which aspect of the Fourth or Fourteenth Amendment has or have been violated by any of the defendants. However, in paragraph 98 of the complaint, the plaintiffs allege they are entitled to a declaratory judgment for "unconstitutional deprivations of liberty and privacy without due process of law and . . . a denial of the equal protection of the laws." *Complaint* ¶ 98.

10

defendant Sexton, by directing the investigation of Miss Story after the strip search, violated her clearly established constitutional rights guaranteed by the Fourteenth Amendment, *Complaint* ¶ 96; that defendant Sexton and Merrill, by publishing to the news media confidential and private matters involving Miss Story, violated her clearly established constitutional rights guaranteed by the Fourteenth Amendment. *Complaint* ¶ 97.

In Count XI, the plaintiffs seek injunctive relief by claiming that they and other school children "have a constitutionally protected interest[7] in being free from governmental actions" of the type allegedly perpetrated by the defendants in this cause. *Complaint* ¶ 99.

## III.   STANDARD FOR MOTION TO DISMISS.

For purposes of ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the court must take the allegations of the complaint as true and construe them in a manner most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts . . . which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A complaint may be dismissed when the allegations demonstrate that the plaintiff does not have a claim. *Bruce v. Wade*, 537 F.2d 850, 852 (5th Cir. 1976); *Hepperle v. Johnston*, 544 F.2d 201 (5th Cir. 1976).

---

[7] The plaintiffs do not specify what "constitutionally protected interest" they claim to be so entitled. Only in their *ad damnum* clause after paragraph 102 of the complaint do they assert unlawful practices allegedly in violation of their substantive and procedural due process rights.

## IV.   DISCUSSION.

### A.   Official Capacity Claims Against Individual Defendants.

The plaintiffs have filed a variety of claims against individual defendants which appear, based on their jumbled pleadings, to be directed at those defendants in their official capacities. As the defendants properly argue in their brief, in contrast to individual capacity suits, when an officer is sued under section 1983 in his or her official capacity the suit is simply "'another way of pleading an action against an entity of which an officer is an agent.'" *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (*quoting Kentucky v. Graham*, 473 U.S. at 165, 105 S. Ct. at 3105 (*citing Monell v. Department of Social Servs.*, 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018, 2035 n.55, 56 L. Ed. 2d 611 (1978))). And, "[b]ecause suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond)." *Busby*, 931 F.2d at 776; *see also Kentucky v. Graham*, 473 U.S. at 166, 105 S. Ct. at 3105; *Brandon v. Holt*, 469 U.S. at 471-72, 105 S. Ct. at 877-78. Therefore, the plaintiffs' section 1983 claims asserted against all individual defendants in their official capacities will be dismissed and recharacterized as claims against the entities they represent.

Likewise, under Alabama law "[s]tate officers and employees, in their official capacities" are treated equivalently to the state for liability purposes, because "the action is, in effect, one against the State," *Mitchell v. Davis*, 598 So. 2d 801, 806 (Ala. 1992).

12

Therefore any official capacity claims under state law against the individual defendants will be discussed along with the claims against the entities they represent.

**B.    Individual Capacity Claims Against Individual Defendants.**

### 1.    The Investigation And Search.

In their complaint, the plaintiffs allege that on September 10, 1997, Miss Story was strip searched by defendants Everett, Melendez, Cain, and Walters without any justification or reasonable cause to do so.  Plaintiffs contend that, as a result, these defendants violated the Fourth and Fourteenth Amendments to the United States Constitution. *Complaint* ¶ 33. They also claim that the search was outrageous and was intended to inflict severe emotional harm, and bring pendent state law claims on that basis.  Finally, plaintiffs contend that, by failing to allow Story to contact her mother prior to the search, these defendants violated both the Board's policy,[8] potentially creating a due process claim on Story's behalf for deprivation of this state-created right, and Thompson's constitutional rights to privacy and family integrity.

### a.    Fourth and Fourteenth Amendment Unconstitutional Search Claims -- Section 1983 Qualified Immunity.

In their motions to dismiss, defendants Everett, Cain, Melendez and Walters contend they are entitled to qualified immunity under section 1983 for the individual capacity federal claims brought against them by the plaintiffs.  If the plaintiffs' complaint fails to "state a violation of 'clearly established statutory or constitutional rights of which a reasonable

---

[8] It is not clear to the court why Everett would be bound to a policy promulgated by the Board.  However, the court will ignore this technical point for now, as none of the parties have provided a clear argument regarding its effect.

person would have known,'" then some or all of these defendants will be "immune from liability and even from trial." *See Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992), *cert. denied sub nom, Deutcsh v. Oladeinde*, 507 U.S. 987, 113 S. Ct. 1586, 123 L. Ed. 2d 153 (1993). In this vein, the Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis. "[W]e first consider whether 'the defendant government official [has proven] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred.' If the defendant has met this burden, 'the plaintiff must then demonstrate that the defendant violated clearly established law based upon objective standards.'" *Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1282 (11th Cir. 1998) (quoting *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997)); *see McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995) (discussing the two-step inquiry first promulgated in *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)).

Under the second prong, the court must determine whether the applicable law was clearly established at the time of the challenged action. This is determined by reference

14

to decisions of the Supreme Court of the United States and the Court of Appeals for the Eleventh Circuit. *D'Aguanno v. Gallagher*, 50 F.3d 877, 881 n. 6 (11th Cir. 1995); *Courson v. McMillian*, 939 F.2d 1479, 1498 n. 32 (11th Cir. 1991). The relevant inquiry is "fact specific," *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994), and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994); *see also Cofield v. Randolph County Comm'n*, 90 F.3d 468, 470 (11th Cir. 1996).

As emphasized in *Lassiter*, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violated federal law in the circumstances." *Id.*; *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)(holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). The Eleventh Circuit has warned that plaintiffs must not be permitted "to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" *Id.* at 1150. "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.* (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994)); *see also Jenkins v. Talladega City Bd. Of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (en banc).

The plaintiffs argue that the law regarding the constitutionally permissible scope of a search of a student while attending school was so clearly defined that these four

15

defendants were on notice that the type of search conducted in this instance violated Miss Story's rights guaranteed by the Fourth and Fourteenth Amendment. *Brief of Plaintiff in Response to the Educational Defendants' Motion to Dismiss*, at 4-9. The Court acknowledges that some non-binding authority clearly suggests that, in the absence of a need to prevent imminent and serious harm, a search of a minor school student involving significant removal of clothing is unconstitutional as violative of the Fourth Amendment's prohibition on unreasonable searches and seizures, incorporated against the states via the Fourteenth Amendment. The plaintiff cites *Doe v. Renfrow*, 631 F.2d 91, 92-93 (7th Cir. 1980), *cert. denied*, 451 U.S. 1022 (1981), for this proposition.

However, the Eleventh Circuit has declared that the case law of another circuit "cannot settle the law in this circuit to the point of it being 'clearly established.'" *Hansen v. Soldenwagner*, 19 F.3d 573, 578 n.6 (11th Cir. 1994). The more recent *Jenkins* strip search case, moreover, does not clearly establish the law such that defendants Everett, Cain, Melendez or Walters knew that what they were doing violated the plaintiffs' federal constitutional rights under the Fourth or Fourteenth Amendments. *See Jenkins v. Talladega City Bd. Of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (en banc).

In *Jenkins*, the Eleventh Circuit found that individuals who actively searched school children were entitled to qualified immunity based on their actions, which were buttressed by their suspicions of student theft. *Jenkins*, 115 F.3d at 828. *Jenkins* suggests that the current state of the law on student searches is too uncertain to clearly establish the law under the strict standard applied by the Eleventh Circuit. *Jenkins* discusses at length the landmark case of *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985),

16

a case which sets out the basic standard for student searches on which the plaintiff relies. The Eleventh Circuit concluded that *T.L.O.* provided "no illustration, indication, or hint as to how the enumerated factors [outlined in *T.L.O.*] might come into play when other concrete circumstances are faced by school personnel." *Jenkins*, 115 F.3d at 825.

Nor did *Jenkins* itself add the necessary clarity, as plaintiffs contend. While that case did include some discussion about its own particular facts, the court stated only that these facts were not sufficient to overcome qualified immunity. It did not say anything about what *would* be sufficient to make out a constitutional violation, because the *Jenkins* case in no way determined that the school officials *had* violated the plaintiffs' constitutional rights under the Fourth or Fourteenth Amendments. Any discussion in *Jenkins* about the proper scope of a reasonable search is thus largely irrelevant as a clarification of the law. *Hamilton v. Cannon*, 80 F.3d 1525, 30 (11th Cir. 1996) ("The law cannot be established by dicta.") In any event, the court sees nothing in *Jenkins*' discussion which compels the conclusion hat the actions taken here violated the *T.L.O.* standard.[9] Therefore, the court concludes that the law pertaining to the application of the Fourth Amendment and Fourteenth Amendment to the search of Miss Story had not been developed in a "concrete, factually similar context to the extent that educators were on notice that their conduct was constitutionally impermissible." *Jenkins*, 115 F.3d at 828.

Plaintiffs have failed to direct this court's attention to any case which established, at the time of the search, that it violated the constitution's prohibition on unreasonable

---

[10]The court applies this standard even to defendant Everett, a law enforcement officer, because no clearly established law binds her to a higher standard.

17

searches and seizures. Thus, although the court has grave doubts about the propriety of the search, it has no choice but to grant defendants' request for a dismissal on the basis of qualified immunity. Accordingly, defendants Everett, Cain, Melendez and Walters are entitled to qualified immunity as to the plaintiffs' individual liability, section 1983 claims asserted against them under the Fourth and Fourteenth Amendments for their acts or omissions relating to the search of Miss Story.

In their motions to dismiss, defendants Everett, Cain, Melendez and Walters contend they are entitled to qualified immunity under section 1983 for the individual capacity federal claims brought against them by the plaintiffs. If the plaintiffs' complaint fails to "state a violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known,'" then some or all of these defendants will be "immune from liability and even from trial." *See Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992), *cert. denied sub nom, Deutcsh v. Oladeinde*, 507 U.S. 987, 113 S. Ct. 1586, 123 L. Ed. 2d 153 (1993). In this vein, the Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis. "[W]e first consider

whether 'the defendant government official [has proven] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred.' If the defendant has met this burden, 'the plaintiff must then demonstrate that the defendant violated clearly established law based upon objective standards.'" *Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1282 (11th Cir. 1998) (quoting *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997)); *see McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995) (discussing the two-step inquiry first promulgated in *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)).

Under the second prong, the court must determine whether the applicable law was clearly established at the time of the challenged action. This is determined by reference to decisions of the Supreme Court of the United States and the Court of Appeals for the Eleventh Circuit. *D'Aguanno v. Gallagher*, 50 F.3d 877, 881 n. 6 (11th Cir. 1995); *Courson v. McMillian*, 939 F.2d 1479, 1498 n. 32 (11th Cir. 1991). The relevant inquiry is "fact specific," *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994), and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994); *see also Cofield v. Randolph County Comm'n*, 90 F.3d 468, 470 (11th Cir. 1996).

As emphasized in *Lassiter*, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violated federal law in the circumstances." *Id.*; *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034,

19

3039, 97 L. Ed. 2d 523 (1987)(holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). The Eleventh Circuit has warned that plaintiffs must not be permitted "to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" *Id.* at 1150. "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.* (quoting *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir. 1993), *modified,* 14 F.3d 583 (11th Cir. 1994)); *see also Jenkins v. Talladega City Bd. Of Educ.,* 115 F.3d 821, 823 (11th Cir. 1997) (en banc).

The plaintiffs argue that the law regarding the constitutionally permissible scope of a search of a student while attending school was so clearly defined that these four defendants were on notice that the type of search conducted in this instance violated Miss Story's rights guaranteed by the Fourth and Fourteenth Amendment. *Brief of Plaintiff in Response to the Educational Defendants' Motion to Dismiss,* at 4-9. The Court acknowledges that some non-binding authority clearly suggests that, in the absence of a need to prevent imminent and serious harm, a search of a minor school student involving significant removal of clothing is unconstitutional as violative of the Fourth Amendment's prohibition on unreasonable searches and seizures, incorporated against the states via the Fourteenth Amendment. The plaintiff cites *Doe v. Renfrow,* 631 F.2d 91, 92-93 (7th Cir. 1980), *cert. denied,* 451 U.S. 1022 (1981), for this proposition.

However, the Eleventh Circuit has declared that the case law of another circuit "cannot settle the law in this circuit to the point of it being 'clearly established'." *Hansen v. Soldenwagner,* 19 F.3d 573, 578 n.6 (11th Cir. 1994). The more recent *Jenkins* strip

20

search case, moreover, does not clearly establish the law such that defendants Everett, Cain, Melendez or Walters knew that what they were doing violated the plaintiffs' federal constitutional rights under the Fourth or Fourteenth Amendments. *See Jenkins v. Talladega City Bd. Of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (en banc).

In *Jenkins*, the Eleventh Circuit found that individuals who actively searched school children were entitled to qualified immunity based on their actions, which were buttressed by their suspicions of student theft. *Jenkins*, 115 F.3d at 828. *Jenkins* suggests that the current state of the law on student searches is too uncertain to clearly establish the law under the strict standard applied by the Eleventh Circuit. *Jenkins* discusses at length the landmark case of *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985), a case which sets out the basic standard for student searches on which the plaintiff relies. The Eleventh Circuit concluded that *T.L.O.* provided "no illustration, indication, or hint as to how the enumerated factors [outlined in *T.L.O.*] might come into play when other concrete circumstances are faced by school personnel." *Jenkins*, 115 F.3d at 825.

Nor did *Jenkins* itself add the necessary clarity, as plaintiffs contend. While that case did include some discussion about its own particular facts, the court stated only that these facts were not sufficient to overcome qualified immunity. It did not say anything about what *would* be sufficient to make out a constitutional violation, because the *Jenkins* case in no way determined that the school officials *had* violated the plaintiffs' constitutional rights under the Fourth or Fourteenth Amendments. Any discussion in *Jenkins* about the proper scope of a reasonable search is thus largely irrelevant as a clarification of the law. *Hamilton v. Cannon*, 80 F.3d 1525, 30 (11th Cir. 1996) ("The law cannot be established by

21

dicta.") In any event, the court sees nothing in *Jenkins'* discussion which compels the conclusion hat the actions taken here violated the *T.L.O.* standard.[10] Therefore, the court concludes that the law pertaining to the application of the Fourth Amendment and Fourteenth Amendment to the search of Miss Story had not been developed in a "concrete, factually similar context to the extent that educators were on notice that their conduct was constitutionally impermissible." *Jenkins*, 115 F.3d at 828.

Plaintiffs have failed to direct this court's attention to any case which established, at the time of the search, that it violated the constitution's prohibition on unreasonable searches and seizures. Thus, although the court has grave doubts about the propriety of the search, it has no choice but to grant defendants' request for a dismissal on the basis of qualified immunity. Accordingly, defendants Everett, Cain, Melendez and Walters are entitled to qualified immunity as to the plaintiffs' individual liability, section 1983 claims asserted against them under the Fourth and Fourteenth Amendments for their acts or omissions relating to the search of Miss Story.

### b.    Substantive and Procedural Due Process Claims -- Failure to Follow Parental Notification Policy.

The plaintiffs, however, also bring individual capacity, section 1983 claims against defendants Cain, Melendez and Walters for allegedly violating Miss Story's substantive and procedural due process rights "by failing or refusing to permit the child to contact her parent, and by failing to apprise the child of her constitutional rights prior to interrogation

---

[10]The court applies this standard even to defendant Everett, a law enforcement officer, because no clearly established law binds her to a higher standard.

22

and the conduct of the strip search." *Complaint* ¶ 71. The plaintiffs' claims here are based upon the Board's written policy concerning interrogation of students. *See Complaint* ¶ 70.

The plaintiffs claim that Cain, Melendez and Walters each violated this policy by refusing to allow Miss Story the opportunity to contact a parent prior to the interrogation or search. The defendants, on the other hand, argue they are entitled to qualified immunity on these claims. The court notes that while it appears that these claims are based entirely on the failure to comply with promulgated school policy, or in other words that they claim deprivation of rights created by state law, the court could read these claims as including a due process or substantive due process claim based on a constitutional right to parental notification. The court is not inclined to do so, because the complaint has not clearly stated such a claim, *see GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359 (11th Cir. 1998), because the complaint seems to raise such constitutional rights more clearly in other counts, *see infra* at page 34, and because it appears that the defendants would be entitled to immunity on such a claim in any event. *See id.* If so, defendants would be entitled to prevail because plaintiff has cited no case "clearly establishing" that the defendants' conduct would be a violation of such a constitutional right.

### (1) Qualified Immunity.

The Court must first determine whether these four defendants, any or all, are entitled to qualified immunity under section 1983 as to the due process claims. As explained *supra*, the test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis. Plaintiffs assert that the defense fails at the first stage of this inquiry. At this stage, a government official must

23

demonstrate that "'he was acting within the scope of his discretionary authority when the allegedly wrongful act occurred.'" *Moniz*, 145 F.3d at 1282. The plaintiffs contend that, at least as to claims based on their failure to contact Ms. Thompson, defendants were not "'acting within the scope of [their] discretionary authority,'" *id.*, because they acted in violation of a state policy. The court appreciates both the linguistic and common sense appeal of this argument.

However, defendants contend that the Supreme Court has explicitly mandated a contrary result. Concerned that "officials would be liable in an indeterminate amount for violation of any constitutional right -- one that was not clearly defined or perhaps not even foreshadowed at the time of the alleged violation -- merely because their official conduct also violated some statute or regulation," the Supreme Court has concluded that "[n]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation -- of federal or state law -- unless that statute or regulation provides the basis for the cause of action sued upon." *Davis v. Scherer*, 468 U.S. 183, 194-95 & n.12 (1984). Naturally, no section 1983 cause of action can be based on violation of a state law, much less a state policy, so it would appear that the defendants' alleged violation of the Board's policy does not strip them of immunity. The violation of even a clear state policy, in and of itself, therefore does not strip the defendants of liability. However, plaintiffs' claim that the violation rendered the duties non-discretionary, and thus not protected by immunity, appears to have some possibility of success, at least based on the facts and arguments the court has before it at this point.

The parties have happened upon an unsettled, if rarely posed, question about the qualified immunity scheme. The Supreme Court's *Davis* opinion in fact suggested, as prior Supreme Court cases had indicated, that qualified immunity might not apply to acts that were truly "ministerial." Thus if a state standard clearly mandated a particular course of action, and defendants failed to follow it, immunity might not apply. This "ministerial" exception seems to be the root of step one of the Eleventh Circuit's test for qualified immunity, which requires that defendants prove their actions were discretionary, i.e. not purely ministerial. However, the Supreme Court imposed stringent limits on when this exception would apply.

First, the Court noted that violation of a regulation would forfeit immunity "only if that breach itself gave rise to the appellee's cause of action for damages." *Davis*, 468 U.S. at 196 n.14. Thus the plaintiff must "claim that he is entitled to damages simply because the regulation was violated." *Id.* In so saying, the Court referred to an earlier discussion which indicated that a violation of state law strips a defendant of immunity only when that law provides the "basis for the cause of action." *Id.* at 194 n.12. Thus the Court seemed to require not only that the cause of action be causally linked with the violated state law, i.e. that the constitutional or federal statutory claim sued on resulted factually in the violation of state policy, but that the two must be *legally* linked as well, so that in a sense what is sued for *is* the state violation.[11] Thus a state law violation may have an effect on immunity

---

[11] For example, in *Sellers by Sellers v. Baer*, 28 F.3d 895 (8th Cir. 1994), the Eigth Circuit rejected a claim that police officers' actions fell within the ministerial exception to qualified immunity. State regulations allegedly required officers to take intoxicated individuals to the police station or a detoxification center before releasing them. When officials instead released an intoxicated man in a parking lot, he apparently wandered into traffic and was killed. Despite the factual link between the violation of the regulations and the unfortunate result, the court

if that violation "is itself actionable under § 1983 or bears upon the claim of constitutional right that [plaintiff] asserts under § 1983." *Id.* at 193 (noting that these circumstances were not presented in *Davis* itself).

The court coupled this very stringent requirement with an exceedingly high standard for determining when a policy so constrains a decisionmaker as to make his decisions ministerial. According to the Court, even a policy that provides clear and specific standards does not create a ministerial duty. "[T]he District Court's finding that appellants ignored a clear legal command does not bear on the 'ministerial' nature of appellants' duties. A law that fails to specify the precise action that the official must take in each instance creates only discretionary authority; and the authority remains discretionary however egregiously it is abused." *Id.* at 196 n.14.

Given these extremely stringent requirements set up by the Supreme Court, a number of courts have concluded that the ministerial exception to qualified immunity is essentially a dead letter. *See, e.g., Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) ("'it would be unwise to engage in a case by case determination of Section 1983 immunity based upon the ministerial versus discretionary nature of the particular official act challenged'") (quoting *Coleman v. Frantz*, 754 F.2d 719, 727 (7th Cir. 1985)); *McIntosh v. Weinberger*, 810 F.2d 1411, 1432 (8th Cir. 1987), *vacated and remanded on other grounds sub nom. Turner v. McIntosh*, 487 U.S. 1212, *cert. denied*, 487 U.S. 1217 (1988) (finding "no

found that qualified immunity applied to constitutional claims based on the man's death. It noted that "the plaintiffs make no claim that they are entitled to damages simply because the regulations they cite were violated. Instead, they seek damages based on their claims that the Fifth and Fourteenth Amendments were violated." *Id.* at 902.

26

recent case . . . in which a court has rejected qualified immunity simply because the official in question was performing a ministerial duty") (cited in *Jordan*, 38 F.3d at 1566). In keeping with this trend, the Eleventh Circuit has adopted a very broad definition of discretionary authority. Facing a claim that an act was ministerial and so not protected by immunity because the act was required by a clear policy, that court observed that "[i]n *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994), we interpreted the term 'discretionary authority' to include actions that do not necessarily involve an element of choice. In *Jordan*, we held that qualified immunity was available to a government official whose actions may be ministerial so long as the official's actions '"(1) were undertaken pursuant to the performance of his duties," and (2) were "within the scope of his authority."'" *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995).

While the Eleventh Circuit has not squarely addressed the question of immunity when a defendant *fails* to comply with a specific instruction, rather than complying negligently or incompletely, that court has made it fairly clear that defendants should lose on the first prong of the qualified immunity analysis rarely, if ever. However, this may well be one of those rare instances. The parental notification policy was crystal clear, and indicates precisely what the defendants were supposed to do -- let Story call a parent. Moreover, to the extent that plaintiffs claim that the deprivation of the protections of this policy was itself the deprivation of a state-created interest sufficient to create a due process claim, the case may be one of the few which satisfies *Davis*'s "cause of action" requirement. *Davis*'s high standard is met only in very limited circumstances. However, it may be met when the state policy that was violated creates an entitlement whose

27

deprivation generates a due process claim. "State law may bear upon a claim under the Due Process Clause when the property interests protected by the Fourteenth Amendment are created by state law." *Davis*, 468 U.S. at 193 n.11.

The Sixth Circuit elaborated on *Davis*'s analysis in *Spruytte v. Walters*, 753 F.2d 498, 511 (6th Cir. 1985). Having drawn from *Davis* the principle that "[t]he critical distinction . . . is between violation of regulations that 'bear upon the claim of constitutional right' and those that do not," the court concluded that the violation of a state regulation allowing inmates to receive books was sufficient to strip the defendants of immunity for a due process claim based on the regulation. *Spruytte v. Walters*, 753 F.2d 498, 511 (6th Cir. 1985). On its way to this decision, the court formulated a test which is directly applicable here. "[I]n the context of a violation of due process, the critical distinction between regulations that bear upon the constitutional right and those that do not is collapsed into the distinction between regulations that give rise to the protected interest and regulations that merely provide what process is due once a protected interest has been found." *Id.* Because the violation at issue involved the "very rule that create[d] a protected interest and define[d] the criteria that must be fulfilled before the interest [could] be defeated," the court found qualified immunity inapplicable. *Id.*

This court notes that *Spruytte*'s analysis has positive and negative implications for both parties. While *Spruytte* indicated that violation of a regulation upon which a due process claim is grounded will eliminate qualified immunity, its analysis also suggested that qualified immunity will apply to most other claims. *Spruytte* underscores *Davis*'s point that a causal connection between a state law violation and the deprivation of a

28

constitutional right is not sufficient to affect qualified immunity. Thus a violation of state procedural regulations, even if it leads to the deprivation of a protected interest, will not negate immunity. Instead, as *Spruytte*'s test indicates, the state violation and the resulting federal claim must be legally linked, so that the state violation in fact forms the basis for the federal right asserted.   Therefore, under the *Spruytte* analysis plaintiffs can retain their claims alleging that the violation of the Board's policy was itself a due process violation, but qualified immunity will fatally apply to any other claims by plaintiffs based on the failure to call Ms. Thompson, even though this failure was caused by the violation of the Board's policy.

At this point neither party has given the court any reason to reject *Spruytte*'s reading of *Davis*. *Spruytte*'s test appears to be consistent with *Davis*'s language, and the court finds it persuasive. *See Bowman v. Alabama Dept. of Human Resources*, 857 F. Supp. 1524, 1533 (M.D. Ala. 1994) (adopting the test). It has been applied in circumstances similar to those presented here. *Carlo v. City of Chino*, 105 F.3d 493, 502 (9th Cir. 1997) (refusal to allow inmate to make a telephone call allowed by state regulation). Therefore, at least for motion to dismiss purposes, the court concludes that the defendants are not entitled to immunity for due process violations based directly on the Board's policy, but are entitled to immunity on related claims for which that policy does not provide the "basis for the cause of action." *Davis*, 468 U.S. at 194 n.12.

The plaintiffs here apparently contend that the parental notification policy itself created a procedurally protected right. If, and this is of course a big if, plaintiffs' due process claims based on the policy are ultimately found to be viable as a matter of

substantive law, qualified immunity may not apply to these claims. Therefore, at least for the time being, the court concludes that defendants are not entitled to qualified immunity as to this narrow range of claims. The court cautions, however, that immunity applies to everything else. "[I]f a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity only with respect to damages caused by that violation." *Davis*, 468 U.S. at 194 n.12. This includes claims regarding the failure to contact Ms. Thompson which are not based solely on the fact that the regulation was violated, i.e. privacy or family integrity claims. *See id.* at 196 n.14. In all other respects, the court concludes that defendants were acting within the "scope of [their] authority" and in "performance of [their] duties" in handling the search of Miss Story, and are entitled to immunity unless the plaintiffs can show that they violated clearly established law. The plaintiffs have not carried this burden as to any claims based on the failure to call Ms. Thompson, so only those claims for which immunity does not apply, and in which plaintiffs therefore have some room to make creative arguments, can possibly survive.

The court now turns to the narrow range of claims in which qualified immunity may not apply.

### (2)    Substantive Due Process.

The Court readily concludes that the plaintiffs do not have a substantive due process claim against any of these defendants for the alleged violation of the Board policy or declaration. Substantive due process applies only in those rare cases involving rights which are "'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'"

*McKinney v. Pate,* 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Connecticut,* 302 U.S. 319, 325 (1937)). For this reason, "areas in which substantive rights are created only by state law . . . are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.'" *Id.* at 1556 (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 299 (1985) (Powell, J., concurring). Accordingly, all substantive due process claims will be dismissed.

### (3)    Procedural Due Process.

The plaintiffs' procedural due process claims against these defendants is more promising for the plaintiffs, at least at this early juncture in the proceedings. Unlike the broad prohibition of substantive due process claims based on state-created property interests, the law leaves open the possibility that the plaintiffs' procedural due process claims, based on their alleged failure to allow for parental notification, are actionable.

The Fifth Amendment to the United States Constitution restrains the federal government, and the Fourteenth Amendment, section 1, restrains the states, from depriving any person of life, liberty, or property without due process of law. The requirements of procedural due process apply only to the deprivation of interest encompassed by the Fourteenth Amendment's protection of liberty and property. *Buxton v. City of Plant City, Fla.,* 871 F.2d 1037, 1041 (11th Cir. 1989). Thus, the plaintiffs here must establish that they have been deprived of an interest that could invoke procedural due process protection. *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S. Ct. 2694, 2698, 33 L. Ed. 2d 570 (1972). To determine whether due process requirements apply, the Court must first look to the nature

of the interest at stake. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S. Ct. 2701, 2705, 33 L. Ed. 2d 548 (1972).

A quick review of the relevant due process precedent indicates that the border between what is protectable and what is not is hazy at best. While an individual's interest in life is readily cognizable, definable, and apparent under the Due Process Clause, the liberty and property interests, although comprehensible, are difficult to define. In fact, no attempt has ever been made to comprehensively define these judicial terms of art. *See Buxton*, 871 F.2d at 1042. Although the Supreme Court has not defined "liberty" with any great precision, that term is not confined to mere freedom from bodily restraint. *See Board of Regents v. Roth*, at 572, 92 S. Ct. at 2706; *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S. Ct. 693, 694, 98 L. Ed. 884 (1954). On the other hand, "[w]hile the Supreme Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries which conceptualize liberty and property." *Buxton*, 871 F.2d at 1042 (citing *Board of Regents v. Roth*, 408 U.S. at 572, 92 S. Ct. at 2706).

It is clear that the interests to be protected are creatures of state law. "The liberty and property interests obtain constitutional status after they have been initially recognized and protected by state law." *Paul v. Davis*, 424 U.S. 693, 710, 96 S. Ct. 1155, 1164, 47 L. Ed. 2d 405 (1976). Courts have repeatedly held that the procedural guarantees of the Fourteenth Amendment apply whenever the state seeks to remove or significantly alter that protected status. *See Paul v. Davis*, at 710, 96 S. Ct. at 1164. Then-Justice Rehnquist, writing for the majority in *Paul v. Davis*, provided two examples of this proposition.

Justice Rehnquist explained that by issuing driver's licenses, states recognize their citizens' right to operate a vehicle on state highways. Thus, the Supreme Court held that the state could not withdraw this right without providing due process. *See Bell v. Burson*, 402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971). Justice Rehnquist then explained that the state cannot alter the status of a parolee because of alleged parole violations, after affording the parolee the right to remain at liberty as long as the conditions of his parole were not violated, without giving the parolee certain procedural safeguards which guarantee due process. *See Paul v. Davis*, at 711 (citing *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)).

In *Bell v. Burson*, and *Morrissey v. Brewer*, state action distinctly altered or extinguished a right or status previously recognized by state law. The Supreme Court found that these alterations, which officially removed the interest from the recognition and protection previously afforded by the state, were sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. *See Paul v. Davis*, 424 U.S. at 711, 96 S. Ct. at 1165. The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *See Board of Regents v. Roth*, 408 U.S. at 569, 92 S. Ct. at 2705; *Buxton v. City of Plant City, Fla.*, 871 F.2d 1037, 1041 (11th Cir. 1989); *Hunter v. Parole and Probation Commission*, 674 F.2d 847, 848 (11th Cir. 1982).

The court acknowledges that, construing the allegations of the complaint as true, Miss Story was entitled, under binding school policy, to an opportunity to call her mother before being interrogated. This right *may* rise to the level of either a liberty or property

33

interest. *See Carlo v. City of Chino*, 105 F.3d 493, 502 (9th Cir. 1997) (finding liberty interest in inmate's right to a phone call). The plaintiffs allege that these four defendants refused to allow her to contact her parent and that after indicating they would do so on her behalf they failed to carry out their promise. As a result, the Court concludes that the plaintiffs *may* have stated a valid procedural due process claim against these defendants for this alleged violation of the Board policy. While difficult questions of law remain, neither party has provided this court with a clear analysis of the problem. Because qualified immunity does *not* apply to these limited claims, the court is not willing to dismiss these claims at this point without a solid legal reason for rejecting them.

Therefore the court will deny defendants' motions to dismiss regarding the procedural due process claims against Everett, Cain, Melendez and Walters based on their failure to comply with the Board's notification policy.

### c.   Privacy and Family Integrity Claims.

Plaintiff Thompson also brings a section 1983 claim against defendants Cain, Melendez, Walters, and Everett for interference with the parent-child relationship and violations of privacy rights allegedly guaranteed by the Fourteenth Amendment to the United States Constitution via section 1983. *Complaint* ¶¶ 84-89. The plaintiffs have cited a number of cases upholding this right in various contexts, and the defendants have not convinced the court that this claim is doomed for substantive reasons, at least at this stage of the proceedings. However, for the reasons set out above, the court concludes that qualified immunity applies to these claims. None of the cases cited by the plaintiffs are sufficiently similar to the present case to clearly establish that these defendants' action

34

violated Thompson's rights. Therefore these claims will be dismissed as against Cain, Melendez, Walters, and Everett in their individual capacities based on qualified immunity.

### d.   Failure to Train and Promulgate Policies.

Plaintiffs assert a number of claims flowing from the search and alleging that individual defendants other than those participating in the search failed to provide proper guidance or training to those defendants who did participate, and did so with reckless indifference to the consequences.   Plaintiff directs these claims against the Board Members, Chairman Sellers, and Sheriff Sexton. The court suspects that these claims are tricks of the light caused by plaintiffs' unclear pleading, were included to support liability for official capacity claims, and seem to be directed at these defendants in their individual capacities only because plaintiffs did not clearly distinguish between individual and official capacity claims. Nonetheless, these claims have been asserted, and the court must deal with them. Therefore, it observes that plaintiffs have submitted no case law indicating that such a failure to provide training or guiding policies, under these circumstances, constitutes a clearly established violation of any constitutional right. *See Gold v. City of Miami*, 121 F.3d 1442, 1447 (11th Cir. 1997) (finding no clearly established law mandating training). Because the plaintiffs have failed to point to a violation by these defendants of controlling, "'clearly established law,'" *Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1282 (11th Cir. 1998) that is "fact specific," *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994), the section 1983 individual capacity claims asserted against them based on failure to train, failure to promulgate policies, or the like will be dismissed. These appear to be

the only individual capacity claims asserted against defendant the Board Members, so all claims against these defendants will be dismissed.

### e. Pendent State Law Claims.

Defendants Everett, Cain, Melendez and Walters assert they are entitled to dismissal of the plaintiffs' state law claims for the torts of outrage, and intentional and negligent infliction of emotional distress because they are protected by sovereign immunity and discretionary function immunity. The plaintiffs contend, on the other hand, that these defendants are not entitled to any immunity on the state law claims. *See Brief of Plaintiffs in Response to the Educational Defendants' Motion to Dismiss*, at 9-10. However, the plaintiffs fail to cite any authority in support of their counter-response. *See id.*

Article I, § 14 of the Alabama Constitution provides that "[t]he State of Alabama shall never be made a defendant in any court of law or equity." ALA. CONST. Art. I, §14. By virtue of this provision, "[s]tate officers and employees, in their official capacities and individually are absolutely immune from suit when the action is, in effect, one against the State." *Mitchell v. Davis*, 598 So. 2d 801, 806 (Ala. 1992). "Even absent the requisite identity between the State and the state official or employee defendant to invoke absolute immunity, the . . . doctrine of substantive immunity may yet be invoked if the official or employee 1) is engaged in the exercise of a discretionary function; 2) is privileged and does not exceed or abuse the privilege; or 3) is not negligent in the performance of his responsibility." *DeStafney v. University of Alabama*, 413 So. 2d 391, 395 (Ala. 1982). Thus, the court must determine whether defendants Everett, Cain, Melendez and/or Walters are entitled to absolute immunity or discretionary function immunity under Alabama law.

36

### (1) Absolute Immunity.

Defendants Cain, Melendez and/or Walters are entitled to absolute immunity *if* the plaintiffs' claims against them are, in effect, claims asserted against the State. *Mitchell,* 598 So. 2d at 806. "In determining whether an action against a state officer or employee is, in fact, one against the State, the Court will consider such factors as the nature of the action and the relief sought." *Phillips v. Davis,* 555 So. 2d 81, 83 (Ala. 1989).

Plaintiffs' state law claims against these individual defendants cannot be considered claims against the State. The Alabama Supreme Court has repeatedly held that tort actions for personal injuries asserted against state employees and officials are not actions against the State for purposes of section 14 absolute immunity. *Mitchell v. Davis*, 598 So. 2d 801, 806 (Ala. 1992); *Barnes v. Dale*, 530 So. 2d 770, 782 n.7 (Ala. 1988); *DeStafney v. University of Alabama*, 413 So. 2d 391, 395 (Ala. 1982); *Nance v. Matthews*, 622 So. 2d 297, 300 (Ala. 1993). Since all of the plaintiffs' state law claims are grounded in tort, defendants Everett, Cain, Melendez and Walters are not entitled to absolute immunity afforded state officials under section 14.

### (2) Discretionary Function Immunity.

Under Alabama law, public officers and employees enjoy discretionary function immunity from suit under the rule set forth in the *Restatement (Second) of Torts*, section 895D (1977):

> [The Alabama Supreme Court] has adopted the tort liability rule for public officers found in *Restatement (Second) of Torts*, which provides as follows:
>
> "(1) Except as provided in this Section a public officer is not immune from tort liability.

37

"(2)   A public officer acting within the general scope of his authority is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function.

"(3)   *A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if*
  "(a)   *he is immune because engaged in the exercise of a discretionary function,*
  "(b)   he is privileged and does not exceed or abuse the privilege, or
  "(c)   his conduct was not tortious because he was not negligent in the performance of his responsibility."

*Restatement*, § 895D, "Public Officers" (1977) (emphasis added); *see also Barnes*, 530 So. 2d at 783; and *DeStafney*, 413 So. 2d at 393.

*Phillips v. Thomas*, 555 So. 2d 81, 84 (Ala. 1989).  In the present case, defendants Cain, Melendez and/or Walters "may be entitled to qualified, or substantive, immunity if they were engaged in the exercise of a discretionary function." *Nance v. Matthews*, 622 So. 2d 297, 300 (Ala. 1993).

"'[W]hether a particular defendant is engaged in a protected discretionary function and is thereby immune from liability for injuries he causes is a question of law to be decided by the trial court.'" *Phillips*, 555 So. 2d at 84 (*quoting Grant v. Davis*, 537 So. 2d 7, 8 (Ala. 1988)).

In determining whether a function or act is discretionary, rather than ministerial, the court must focus essentially on whether the function or act requires the actor to exercise judgment. As the Alabama Supreme Court has stated:

"'[M]inisterial acts' [are] those involving '[l]ess in the way of personal decision or judgment or [in which] the matter for which judgment is required has little bearing of importance upon the validity of the act'.... '[M]inisterial acts are those done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done.' [Citing

38

Restatement (Second) of Torts, § 895D, cmt. f (1979).] Conversely, 'discretionary acts' are defined as follows by *Black's Law Dictionary* 419 (5th ed. 1979): "Those acts [as to which] there is no hard and fast rule as to course of conduct that one must or must not take and, if there is [a] clearly defined rule, such would eliminate discretion. . . . One which requires exercise in judgment and choice and involves what is just and proper under the circumstances.'"

*Nance v. Matthews*, 622 So. 2d 297, 300 (Ala. 1993) (*quoting Smith v. Arnold*, 564 So. 2d 873, 876 (Ala. 1990)).

The Alabama Supreme Court has stated, however, that distinguishing between these functions on the basis of definitions alone, however, is not always helpful. *Nance*, 622 So. 2d at 300. Rather, "[t]he problem is not to define terms like 'discretionary' . . . but to make a pragmatic assessment of what, if any, degree of immunity is necessary to enable the particular governmental function to be effectively performed." *Id.* (*quoting Bell v. Chisom*, 421 So. 2d 1239, 1241 (Ala. 1982)).[12]   The decision of whether a defendant's actions constituted discretionary functions is solely within the province of the court. *See Louviere v. Mobile County Bd. of Educ.*, 670 So. 2d 873, 877 (Ala. 1995) (stating that "[w]hether a particular defendant is engaged in a protected discretionary function, and is thereby

---

[12]   The Alabama Supreme Court has also set forth a series of factors to be employed in determining whether an act is discretionary or ministerial:

> The following factors should be considered in determining whether a state officer or employee is engaged in a discretionary function: the nature and importance of the function that the officer or employee is performing; the extent to which passing judgment on the exercise of discretion will amount necessarily to passing judgment on the conduct of a coordinate branch of government; the extent to which the imposition of liability would impair the free exercise of discretion by the officer or employee; the extent to which the ultimate financial responsibility will fall on the officer or employee; the likelihood that harm will result to members of the public if the action is taken; the nature and seriousness of the type of harm that may be produced; and the availability to the injured party of other remedies and other forms of relief.

*Mitchell v. Davis*, 598 So. 2d 801, 807 (Ala. 1992) (*citing Barnes v. Dale*, 530 So. 2d 770, 784 (Ala. 1988)).

immune from liability, is a question of law to be decided by the trial court"). Courts engage in this pragmatic assessment by reviewing the Alabama Supreme Court's prior determinations of those acts which are deemed discretionary or ministerial. *Nance*, 622 So. 2d at 300.

The Alabama Supreme Court, on numerous occasions, has held that the supervision and discipline of students by school employees/officials are discretionary functions and, therefore, teachers, principals and members of a board of education are immune from civil liability for acts performed in their roles. *See, e.g., Bonwell v. Bobo*, 659 So. 2d 98 (Ala. 1995) (holding that teachers, principals, superintendent, and members of the Board of Education were immune from liability for negligence involving alleged sexual abuse and assault and battery of a student); *LS.B. v. Howard*, 659 So. 2d 43 (Ala. 1994) (holding that a school principal had discretionary function immunity for allegedly negligent supervision of a student who was raped at school); *Faulkner v. Patterson*, 650 So. 2d 873 (Ala. 1994) (holding that Board of Education employee possessed discretionary function immunity as to the claim by a student injured in an ice skating accident); *Deal v. Hill*, 619 So. 2d 1347, 1348 (Ala. 1993) (holding that school officials are entitled to discretionary function immunity when engaging in student discipline); *accord Boyett v. Tomberlin*, 678 So. 2d 124 (Ala. Civ. App. 1995) (holding that school principal possesses discretionary function immunity when determining appropriate punishment for student who left classroom without permission). Likewise, Alabama courts have often noted the discretionary nature of the decisions police officers are faced with. *See, e.g., Wright v. Wynn*, 682 So. 2d 1 (Ala. 1996).

The plaintiffs in the present case allege that officer Everett, school principal Cain, assistant principal Melendez and Ms. Walters were guilty of negligence,[13] along with numerous intentional torts, in allowing the search to take place. Among these claims are the tort of outrage, intentional infliction of emotional distress, and negligent infliction of emotional distress. The only facts alleged by the plaintiffs against these defendants that arguably suggest that the defendants acted outside their "discretionary function" are that, by failing or refusing to permit Miss Story to contact her parent prior to interrogation, the defendants intentionally, negligently or willfully violated the Board's written policy, thus constituting tortious conduct injuring the plaintiffs. *See, e.g., Complaint* ¶¶ 90-93. Most, if not all, of the remaining claims are based on discretionary acts, and Alabama's version of qualified immunity will apply. For example, any decision to contact Tuscaloosa law enforcement officers and to turn the investigation over to them was, as a matter of law, fully within the discretion of the school officials. Moreover, the conduct and scope of the search was clearly a discretionary decision made by these officials and Everett.

Alabama's qualified immunity has limits, however. The Alabama Supreme Court has held that "a state employee is not protected by § 14 when he acts 'willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law.'"[14] *Mitchell v. Davis*, 598 So. 2d 801, 806 (Ala. 1992) (*quoting Phillips v. Thomas*,

---

[13] Specifically, plaintiffs allege that defendants negligently inflicted emotional distress. *Complaint* ¶ 92. The court has serious doubts about the viability of this claim under state law, but has not been briefed on the issue and so will not address it for now.

[14] At least one court has read recent precedent from the Eleventh Circuit as directing the conclusion that Alabama grants absolute immunity even to officials sued in their individual capacity. *See Godby v. Montgomery County Board of Education*, 996 F. Supp. 1390, 1415 (M.D. Ala. 1998) (Albritton, C.J.). After noting that Alabama's state courts have not always been very precise in their discussions of the immunity issue, Judge Albritton points

41

555 So. 2d 81, 84 (Ala. 1989)). The Alabama Supreme Court has never spoken to the

precise meaning of these various terms. However, the Court has held that § 14 protects

state officials from liability for not only negligent, but also willful and wanton, conduct. *See*

*Nance v. Matthews*, 622 So. 2d 297, 302 (Ala. 1993). As applied in *Nance*, the Supreme

Court's holding in *Hill v. Allen*, 495 So. 2d 32 (Ala. 1986), apparently extends the protection

of § 14 to any conduct not involving fraud or bad faith, if the actions taken are within the

scope of an official's discretion. *See Nance*, 622 So. 2d at 301-02. In evaluating the

meaning of "bad faith," it is important to note that, in both *Nance* and the case it relied on,

*Hill*, the plaintiffs claimed intentional wrongdoing on the part of one or several defendants,

but those defendant were not involved in the immunity dispute. The defendants who were

immunized were accused only of negligently or wantonly supervising the real wrongdoers.

---

out that two recent Eleventh Circuit decisions have concluded that Alabama sheriffs receive essentially absolute immunity under state law. *See id.* at 1415-16 (citing *McMillian v. Johnson*, 101 F.3d 1363, 1365 (11th Cir. 1996), *cert. den.* 117 S. Ct. 2514 (1997) and *Tinney v. Shores*, 77 F.3d 378 (11th Cir. 1996). Seeing no reason to treat sheriffs differently from other officers, Judge Albritton concluded that the same analysis should apply to any state officer. While the court is sympathetic to Judge Albritton's reading of the Eleventh Circuit's precedent, this court must respectfully choose another path. *Tinney* relied on a line of Alabama cases setting out specific limitations on suits against sheriffs, and has been cited with approval by a concurring Justice in a later state case applying the same sheriff-friendly rules. *See Purvis v. Mobile County*, 689 So. 2d 794, 796 n.2 (Ala. 1997) (Houston, J., concurring specially). That case seemed to imply a distinction between ordinary employees and a "constitutional officer" like the sheriff, and to suggest that the special protections relied on in *Tinney* apply only to the latter. *Id.* at 796-97. As Judge Albritton points out, *Tinney* does discuss principles that seem generally applicable to all state officers in reaching its conclusion that absolute immunity applies. For example, all officers are, like sheriffs "absolutely immune from suit when the action is, in effect, one against the state." *Tinney*, 77 F.3d 383. This language is "confusing," *McMillian*, 101 F.3d at 1365, because *Tinney* involved an individual capacity claim against the sheriff, a claim which does not seem to be "in effect . . . against the state." The very state case *Tinney* referred to indicated that this language, essentially a term of art in Alabama immunity law, required a complex inquiry into the "nature of the action and the relief sought," and that this requirement for absolute immunity often would not be met in individual capacity cases. *Phillips*, 555 So. 2d at 83. This court is not at all sure what *Tinney*'s use of the language was intended to signify. Given this ambiguity, this court is inclined to read *Tinney*'s broader language as dicta, ancillary to the main analysis of the sheriff cases and providing no precise instructions regarding the case presented here. Thus, like the panel in *McMillian*, this court will follow *Tinney*'s highly protective rule regarding sheriffs, *see infra* at pp. 49-50. However, it will otherwise attempt to divine the proper scope of immunity directly from the state court cases.

Thus no "bad faith," in the usual sense of conduct driven by some improper motive,[15] was alleged against these defendants. The court concludes, then, that *Nance's* reference to "bad faith" should be interpreted according to the usual definition of the word, to mean in essence intentionally wrongful misconduct

The relatively broad scope of immunity provided by *Nance*, however, does not protect officials who violate established state law. *Nance* reiterates the point that immunity does not protect officials for "acts committed beyond their authority," *id.* at 302, and refers specifically to the court's prior observations that "acts that are generally discretionary may be composed of ministerial elements." *Id.* at 301 (citing *Phillips v. Thomas*, 555 So. 2d 81, 86 (Ala. 1989)). If an act is ministerial, of course, it does not entitle the actor to immunity at all. "For example, if the department guidelines require that specific steps be taken . . . or specify the manner in which they are to be taken, the performance of such steps is not discretionary, and, thus, a state employee's negligence with respect to those particular ministerial acts is actionable." *Phillips*, 555 So.2d at 86. Read in light of these holdings, the terms "willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law" apparently require that the actions taken must violate an established policy or have been driven by an improper motive. Here presumably that motive would be a conscious desire to inflict harm.

---

[15] The Alabama courts have never clearly defined the term "bad faith" as it is used in the immunity context, so the court assumes that the term is used in its ordinary sense. Black's Law Dictionary indicates that the term covers "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." BLACK'S LAW DICTIONARY 94 (abr. 6th ed. 1991).

As applied to the present case, then, the Court must determine whether the possibility exists, based upon the allegations in the complaint, that defendants Everett, Cain, Melendez and/or Walters' actions were consciously designed to inflict mental suffering or violated established policies. The court concludes that the relatively flexible policies regarding searches and investigations left the school officials sufficient leeway to make their decisions discretionary. "[T]hese duties . . . do require a considerable amount of discretion within department guidelines," *Phillips*, 555 So. 2d at 86, and so these decisions are entitled to immunity if not made in bad faith. While the plaintiffs have failed to allege "fraud or [in] bad faith,"[16] *Nance*, 622 So. 2d at 302, in those terms, the court is satisfied that the allegations contained in Count VIII ("Pendent Claim of Outrage Under the Common Law of the State of Alabama") and Count IX ("Pendent Claim for Intentional Infliction of Emotional Distress Under the Common Law of the State of Alabama"), which suggest that the defendants intentionally inflicted emotional harm on the plaintiffs, is sufficient to survive even Alabama's stringent immunity defense, at least for now.

Claims based on lesser degrees of culpability, for example negligence, are covered by immunity, and will be dismissed, except to the extent that they are based on violations of the Board's parental notification policy. The court notes that the Board's policy clearly indicated that defendants were to allow Story to contact her mother. This duty was a ministerial one, so immunity will not apply. Claims based on this failure will survive

---

[16] The plaintiffs merely allege that "Defendants Cain, Melendez, [and] Walters . . ., by virtue of their conduct at the time of the strip search . . . *intentionally* outraged the Plaintiff and Plaintiff's minor child within the meaning of *American Road Service Company v. Inman*," *Complaint*, ¶ 90; and that "Defendants Cain, Melendez [and] Walters . . . "intentionally and willfully," *id.* at ¶ 91, and "negligently or recklessly inflicted mental and emotional stress and anguish upon the said Kim Story and Carolyn Thompson." *Id.* at ¶ 92.

defendants' motion to dismiss, although the court has doubts about their viability under substantive tort law. That is a question for another day, however.

### (3)    Substantive Tort Law.

Under Alabama law, to state a claim for the tort of outrage, or intentional infliction of emotional distress,[17] the plaintiff must allege and prove "that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993).

Because these causes of action are available only in the most egregious circumstances, very few cases present a question for the jury. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). A determination as to whether conduct is sufficiently objectionable to support a cause of action for outrage or intentional infliction of emotional distress may be made by the trial court as a matter of law. *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985). In fact, virtually every case in which state courts have allowed claims of outrage to go to the jury falls into one of three narrow categories: 1) "cases having to do with wrongful conduct in the context of family burials"; 2) cases in which "insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim"; and 3) cases "involving egregious sexual harassment." *Thomas*, 624 So. 2d at 1044.

---

[17]Though the plaintiffs have pled them in separate claims, these two torts are essentially the same under Alabama law.

"Given the limited nature of this cause of action," *id.,* this court is generally reluctant to allow claims based on outrage to proceed. However, in this case, if plaintiffs can prove what they have alleged -- that defendants unlawfully strip-searched Miss Story with the intent of causing her severe emotional distress, the court finds a plausible claim of outrage. If these allegations are true, the claim fits neatly within the sexual abuse category, one of the few categories in which outrage claims are viable. Thus the court is not willing to dismiss these claims without at least some further factual development to bear out the truth of these allegations.

Defendants' motions to dismiss will be denied as to plaintiffs' claims for intentional infliction of emotional distress and outrage against defendants Everett, Cain, Walters, and Melendez based on the search, and will be denied as to any state law claims based on these same defendants' failure to comply with the Board's parental notification policy. All other state law claims against these defendants will be dismissed.

### 2.   The Aftermath of The Search.

Plaintiffs bring a number of claims alleging that the individual defendants, while participating in a "damage control" campaign, harassed Miss Story at school, lied about her in the papers, and even released information from sealed juvenile court records. For example, plaintiffs contend that defendant Cain made "material misstatements" about the investigation in a television interview, and that John Merrill, the alleged "spokesperson of the Board," and Sheriff Sexton informed the news media that during the search it was revealed that Miss Story "wore no underwear," which was an allegedly false statement. *Complaint* ¶¶ 34-37. Sheriff Sexton also stands accused of interrogating students at the

46

middle school after the search, *Complaint* ¶ 35, and of mentioning to the media an arson case about which he said he had dealt with "this family before." *Complaint* ¶ 36. The plaintiffs claim that this conduct violated Miss Story's Fourth and Fourteenth Amendment rights.[18] The plaintiffs seek declaratory relief and allege that the defendants, by publishing to the news media confidential and private matters involving Miss Story, violated her clearly established constitutional right to privacy guaranteed by the Fourteenth Amendment. *Complaint* ¶¶ 97-98. The plaintiffs also contend that Sexton knowingly violated Story's constitutional right to privacy by intentionally disclosing the contents of a sealed juvenile court file concerning Miss Story.[19] *Complaint* ¶¶ 74, 76-83. Finally, the plaintiffs assert in Count VIII the tort of outrage under Alabama law based on defendants' Sellers, Sexton, and Merrill, "official and overreaching misconduct" after the alleged strip search incident took place.[20] *Complaint* ¶ 90.

---

[18] The same claim is made against Ms. Everett, though it is not clear from the facts alleged what role she purportedly played in all of this. In the absence of any specific factual allegations, claims against Everett or her employer, the City, based on general assertions that she participated in the "damage control" campaign will be dismissed. *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359 (11th Cir. 1998).

[19] This claim also refers to the Fourteenth Amendment right to "liberty." Because there are no references in the claim to procedural due process, the court will assume that this reference is intended only to evoke the idea of substantive due process, one of the well-springs of the right to privacy. Indeed, the protections of substantive due process extend to the penumbral right to privacy. *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994). Because the court sees no functional difference between a claim based on the privacy right and a substantive due process claim invoking that same right, the court will not discuss the two approaches separately.

[20] The defendants argue in their brief that Sellers should be held liable for statements she allegedly made at a press conference. *See Brief of Plaintiffs in Response to the Educational Defendants' Motions to Dismiss* at 17-18. However, such allegations are not included in their Complaint. The court will not add facts to the complaint at this stage to defeat a motion to dismiss, particularly where section 1983 claims are involved. *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359 (11th Cir. 1998).

a.   **Section 1983 Claims for Violations of the Right to Privacy and the Fourth and Fourteenth Amendments.**

As an initial matter, the court notes that it has some trouble understanding what constitutional rights defendants allegedly violated by this conduct. The right to privacy is repeatedly mentioned, so the court will discuss this claim. However, the court has not located any other references to specific rights applicable to these circumstances. The complaint refers only to the Fourth and Fourteenth Amendments. *See, e.g., Complaint* ¶ 41. General references to the Fourteenth Amendment are not sufficient, because that amendment is the repository of virtually all constitutional guarantees against state action. Nor can the court understand the relevance of the Fourth Amendment to post search conduct, and the complaint provides no specific guidance. Therefore only a privacy claim seems to be properly raised by the complaint. *See GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359 (11th Cir. 1998). In any event, the plaintiffs have certainly not pointed to any other right established clearly enough to overcome qualified immunity.

(1)   **Privacy Right -Substance.**

As a matter of substantive law, plaintiffs' privacy claim may have some merit. Based on the Supreme Court's decisions in *Whalen v. Roe*, 429 U.S. 589 (1977) and *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), the Eleventh Circuit and its predecessor, the Fifth Circuit, have recognized a "constitutional right to privacy, which consists of two strands: the individual's interest in avoiding disclosure of personal matters and the interest in independence in making important decisions." *James v. City of Douglas*, 941 F.2d 1539, 1543-44 (11th Cir. 1991). While the right "has vague contours and

48

has been in a state of flux in recent years,"[21] *id.* at 1543, plaintiffs' claim that the government revealed sensitive, personal information may be sufficient to indicate a violation of this right. Although it is not clear in this case that the defendants violated this right, it is not clear that they did not, either. The court will not dismiss this claim as *substantively* flawed without further development of the facts and more extensive briefing by the parties.

### (2)   Qualified Immunity.

As the discussion above makes clear, however, the right to privacy is, by nature, amorphous. While plaintiffs might ultimately convince this court that violations of the right have occurred, the result is by no means clear. The contours of qualified immunity in the Eleventh Circuit have been thoroughly reviewed above. Viewed in the harsh light of the qualified immunity standard, it is clear that plaintiffs have utterly failed to carry their burden of demonstrating a violation of clearly established federal law.[22] Plaintiffs have certainly not directed this court's attention to controlling precedent with facts even remotely similar. Therefore plaintiffs have not identified any violations by defendants of "'clearly established law,'" *Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1282 (11th Cir. 1998), relating to privacy. The section 1983 individual capacity claims asserted against defendants Everett, Cain, Melendez, Sellers, Merrill and Sexton based on their post-search conduct will be dismissed.

---

[21] For example, information relating to criminal records and proceedings may not be protected. *See Nilson v. Layton City*, 45 F.3d 369 (10th Cir. 1995). Whether the logic in *Layton* should be adopted by the Eleventh Circuit and this court, and even if it were what result this logic would lead to in this case, are still open questions.

[22] Plaintiffs point out that Sexton may have violated state laws relating to the confidentiality of juvenile court records. However clearly established such state law may be, its violation does not strip Sexton of qualified immunity. *Davis v. Scherer*, 468 U.S. 183, 194-96 & n.12 (1984).

b.     **State Law Claims.**

The plaintiffs assert state law outrage and intentional infliction of emotional distress claims against defendants Sexton, Sellers, and Merrill based on their post-search conduct. The defendants claim that they are entitled to immunity as to these claims, and also assert that the actions taken do not rise to the level of outrage.

(1)     **Immunity.**

For the reasons outlined *supra* at pages 41-44, the court concludes that immunity does not protect ordinary state officials such as Merrill and Sellers from claims based on torts requiring a specific intent to harm, like outrage. However, under binding Eleventh Circuit authority, Sheriff Sexton is entitled to immunity even against claims of intentional misconduct. In *McMillian v. Johnson*, 88 F.3d 1554, 1572-73 (11th Cir. 1996), the Eleventh Circuit ruled "that the defense of sovereign immunity does not bar suits against state officers for torts committed willfully, maliciously, and outside the scope of their authority" and concluded that, if a sheriff was being sued in his individual capacity, "the Alabama Supreme Court would [not] *sub silentio* excuse sheriffs from its oft-repeated rule that sovereign immunity does not protect an official from liability for willful or malicious wrongdoing."

However, the Eleventh Circuit subsequently re-visited its holding on this point and deleted the above-referenced *McMillian* language. *See McMillian v. Johnson*, 101 F.3d 1363, 1365 (11th Cir. 1996). While noting that Alabama's appellate courts have not clearly answered the question whether Alabama sheriffs are protected by sovereign immunity under section 14 of the Alabama Constitution when sued in their individual capacities for

50

malicious or intentional wrongdoing, the Eleventh Circuit recognized that a recent decision from its own court, *Tinney v. Shores*, 77 F.3d 378 (11th Cir. 1996), had held that Alabama law shields an sheriff, via the sovereign immunity doctrine, against claims based upon intentional torts. *McMillian*, 101 F.3d at 1365 (citing *Tinney*, 77 F.3d at 383).

Indeed, under *Tinney*, the Eleventh Circuit held that "[u]nder Alabama law, sheriffs and deputy sheriffs, in their official capacities and individually, are *absolutely immune* from suit when the action is, in effect, one against the state." *Tinney*, 77 F.3d at 383 (citing *Phillips v. Thomas*, 555 So. 2d 81, 83 & n.3 (Ala. 1989)) (emphasis added). Applying the *Tinney* rationale, the Eleventh Circuit in its amended opinion in *McMillian*, concluded that the plaintiff's state law claims against a county sheriff, even though such claims asserted malicious or intentional wrongdoing, were barred by sovereign immunity. *McMillian*, 101 F.3d at 1365. Accordingly, all of plaintiffs' state law claims in the present action against defendant Sexton will be dismissed, because he is apparently entitled to virtually absolute immunity.

### (2)   Substantive Law.

As discussed *supra* at pages 44-45, outrage and intentional infliction of emotional distress are extremely limited torts in Alabama. To qualify, conduct almost has to involve misconduct relating to burials, coercive conduct by insurance agents, or egregious sexual harassment. The defendants' post search conduct involves none of these. At best, the defendants' conduct constitutes garden variety libel or invasion of privacy. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). For example, while the statement that defendant was not wearing underwear may have been  hurtful and untrue,

51

and might be likened to sexual harassment, it does not involve the repeated, highly inflammatory language and, quite often, physical conduct that Alabama cases typically require for a valid outrage claim. This isolated comment simply cannot be compared to "egregious" sexual harassment. Defendants' other conduct is not even close to the categories of conduct which result in a viable outrage claim.

"Given the limited nature of this cause of action," this court holds "that the conduct of the defendants . . . cannot be characterized as 'atrocious and utterly intolerable in a civilized society.'" *Id.* (quoting *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)). Therefore plaintiffs' state law claims against defendants Merrill, Sellers, and Sexton will be dismissed.

### C.   Claims Against The Entity Defendants.

#### 1.   Claims Brought Pursuant to Section 1983.

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that governmental entities can, under certain conditions, be liable for acts of their employees under section 1983. There are three entities involved in this lawsuit: The Board, The City, and Sheriff Sexton as representative of the Office of the Sheriff of Tuscaloosa County. Claims against the Board and the City are based almost entirely on the actions of their representatives, the individual defendants Cain, Melendez, Walters, Sellers, and Merrill for the Board, and Everett for the City. The claims against Sheriff Sexton in his official capacity are based on his own acts, along with those of Everett. The entity defendants offer up several reasons why they cannot be held liable under section 1983 for these actions.

52

### a.   Eleventh Amendment Immunity.

Both the Board and Sheriff Sexton argue that any section 1983 claim against them is barred by the Eleventh Amendment. The Eleventh Amendment bars suits by private parties "seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). The Eleventh Amendment, however, does not protect state officials acting in their official capacities from suit for injunctive relief. *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 n.2 (11th Cir. 1994). Eleventh Amendment immunity applies not only in actions against the state itself but also in actions brought against a "state agency or instrumentality." *Id.* The rule, however, does not apply to instances in which the state waives such immunity or Congress specifically abrogates it. With regard to section 1983 claims, however, the State of Alabama has not waived and Congress has not abrogated Alabama's Eleventh Amendment immunity. *See Gorman v. Roberts*, 909 F. Supp. 1493, 1502-03 (M.D. Ala. 1995).

Most important to the analysis here is that sheriffs in Alabama represent the state of Alabama when executing their law enforcement duties. *See Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1526-27 (11th Cir. 1990); *cf. McMillian v. Monroe County, Alabama*, ___ U.S. ___, 117 S. Ct. 1734, 1737 (1997) (holding that Alabama sheriffs represent the state of Alabama, not the county in which they acted as law enforcement officials). In *Carr*, the Eleventh Circuit reiterated its prior holding in *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1525 (11th Cir. 1990), that the Eleventh Amendment bars a section 1983 lawsuit against an Alabama sheriff in his official capacity. *Carr*, 916 F.2d at 1525. In response to the Eleventh Circuit's certified question to the Alabama Supreme Court in *Parker*, the Alabama Supreme

Court held that a sheriff "is an executive officer of the state of Alabama, and thus is immune from lawsuits under the state constitution, except for injunctive actions." *Carr*, 916 F.2d at 1525 (citing *Parker v. Amerson*, 519 So. 2d 442, 443 (Ala. 1987)).

Under the guidance of *Carr*, the plaintiffs' section 1983 official capacity claims against defendant Sexton for money damages will be dismissed. The plaintiffs' section 1983 official capacity claims for injunctive and declaratory relief are not affected by the Eleventh Amendment.

In its brief, the Board claims the same protection, arguing that, as "a local arm of the state, the Board is entitled to claim immunity from suit pursuant to the Eleventh Amendment." *Brief of Defendant Tuscaloosa County Board of Education, et al.* (submitted January 9, 1998), at 13. Though not necessary to the disposition of the plaintiffs' claims against the Board here, the Court points out that it views this argument as disingenuous and a misrepresentation of the controlling law in this Circuit.

Since at least 1990, the Eleventh Circuit has squarely held that county boards of education in Alabama are not entitled to Eleventh Amendment immunity from section 1983 claims. *See Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1511 (11th Cir. 1990); *see also Kendrick v. Jefferson County Bd. of Educ.*, 932 F.2d 910, 914 (11th Cir. 1991). Accordingly, the defendant Board would be unable to shield itself from section 1983 liability via the Eleventh Amendment.

### b. *Monell's* Liability Requirements.

As noted above, except for a few claims against Sheriff Sexton, almost all of the claims against the entity defendants in this case are based on the actions of a subordinate.

54

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that governmental entities can be held liable for acts of their employees under section 1983, but not based on a *respondeat superior* theory.   Under *Monell*, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts  or acts may fairly be said to represent official policy, inflicts the injury . . ., the [local] government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. As the defendant Board points out in its brief, for the government entities to be held liable to the plaintiffs based on the action of employees, it must be alleged and proved that the employees were acting pursuant to an official policy that is facially unconstitutional, that the employees acted in an unconstitutional manner and possessed final policy-making authority with respect to the action taken, or that the entity acted with "deliberate indifference" in some manner. Again, for convenience the court will separate the allegation surrounding the search from those relating to the alleged damage control campaign.

### (1)    The Investigation and Search.

#### (a)    Facially Unconstitutional Board Policy.

Plaintiffs contend that the unconstitutional search, and unconstitutional deprivation of the right to parental notification, carried out by Everett, Cain, Melendez, and Walters should be imputed to the entities they represent.   In reading the plaintiffs' amended complaint, it is not clear which of the available theories of entity liability forms the basis of the plaintiffs' section 1983 claims against the Board. It is clear that the claims against the City and the Sheriff are based solely on the final policymaker and the deliberate indifference theories. These claims will thus be assessed under these rubrics. However,

the allegations regarding the Board are convoluted and may be inconsistent. At one point, the plaintiffs allege that the Board had no valid policy addressing searches and seizures and that the Board has not yet adopted such a policy. *See Complaint* ¶ 42. In the same complaint, plaintiffs allege that the Board did, in fact, have a valid policy concerning searches and seizures and quoted the policy in their complaint. *See Complaint* ¶ 68. Plaintiffs then allege that defendants Cain, Melendez and Walters violated the duly promulgated policy. It is certainly clear, assuming the allegations by the plaintiff are true (as the Court must do at this stage), that the Board *did* have a policy in place. While the plaintiffs make conclusory statements that the policy was vague or ambiguous, they stop short of alleging that the policy was unconstitutional on its face as required.[23] *See Reply Brief of Defendant Tuscaloosa County Board of Education, et al.* (submitted Feb. 2, 1998), at 2. The plaintiffs are left with merely their conclusory allegations and conjecture, unsupported by factual allegations which, if true, would render the policy unconstitutional. Accordingly, the Court concludes that the plaintiffs have not stated a valid claim alleging that the Board's written policy is unconstitutional on its face. *See GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359 (11th Cir. 1998).

### (b) Deliberate Indifference -- Employees' Failure to Follow Written Policy.

The plaintiffs also assert in their complaint that the Board, via the acts of Cain, Melendez and Walters, acted with deliberate indifference by failing to follow the Board's

---

[23] The plaintiffs have argued in their brief that the Board's policy is unconstitutional on its face; however, the Complaint is devoid of such an express allegation.

written policy. The closest the plaintiff comes to alleging facts giving rise to a valid claim against the Board on this basis can be found in their assertion that "Defendants Cain, Melendez, [and] Walters ... violated [the Board's] established policy by failing or refusing to permit the child to contact her parent, and by failing to apprise the child of her constitutional rights prior to interrogation and the conduct of the strip search." *Complaint* ¶ 71.

The plaintiffs pleading here appears to be in the form of seeking relief under a theory of *respondeat superior* liability. Such claims, however, absent any further allegations, are not actionable against the Board because any section 1983 liability eventually imposed upon the Board for the acts or omissions by these three defendants cannot be based upon a *respondeat superior* theory of liability. *See Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Accordingly, no constitutional claim, via section 1983, lies against the Board for the Board employees' alleged failure to follow the written policy.

### (c) Employees' Unconstitutional Final Policymaking Actions.

Plaintiffs can hold the Board, the City, and the Sheriff[24] liable for the acts of Everett, Cain, Melendez and Walters if they can allege and prove two elements: (i) that the action of the governmental actor(s) are unconstitutional, and (ii) that the governmental actor(s) possess final policymaking authority with respect to the action taken. *See Manor*

---

[24] Only declaratory and injunctive relief claims against the Sheriff survive the impact of the Eleventh Amendment.

57

*Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637 (11th Cir. 1991). Thus, the essential section 1983 question before the court here is two-fold: (i) whether the plaintiffs have alleged facts, which, if true, would support a finding that the search to which Miss Story was subjected was unconstitutional, and (ii) whether the plaintiff has alleged facts, which, if true, would suggest that Everett, Cain, Melendez and/or Walters had final policy-making authority. In their briefs, the defendants have not seriously argued the constitutionality issue at this stage of the proceedings. Therefore, the Court will only address the second question.

The Supreme Court has held that a governmental actor's exercise of discretion to effect unconstitutional ends, standing alone, is insufficient to subject the governmental entity to section 1983 liability, absent proof that the actor possesses *final* policymaking authority with respect to the action taken. In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), a plurality of the Court framed this principle as follows:

> Municipal liability [under section 1983] attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official--even a policymaking official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.

*Id.* at 481 (footnote omitted). Four Justices of the Court reiterated this position in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 129-30 (1988), and these principles have become "embedded in the binding precedents of" the Eleventh Circuit. *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997). Thus, if a local government actor, who is given discretion under that government's policy to perform certain duties, exercises that discretion in an unconstitutional manner, such facts do not give rise to government liability

under section 1983, absent proof that the actor possesses *final* policymaking authority with respect to the actions taken. *See Praprotnik,* 485 U.S. at 483-84 n.12.

Of course, identifying the final policymaker is often easier said than done. In many situations, a significant amount of discretion may be delegated to a lower decisionmaker. When this happens, drawing the line between an official's discretion, which will not impose liability on the governmental entity, and final policymaking authority, which will, is not always a simple question of geometry. "It may not be possible to draw an elegant line that will resolve this conundrum." *Praprotnik*, 485 U.S. at 126-27. In this case, for example, Board policy instructs that searches can be made, and police officers called in to investigate, when school officials have reasonable grounds for doing so. The Sheriff and the City of Tuscaloosa has no policy restricting when and how a search should be conducted. As a practical matter, these loose standards leave law enforcement officers and school officials, and in particular the principal as the highest ranking among them, a wide range of latitude in deciding how to handle situations like the one the defendants encountered with Miss Story. The question becomes whether this latitude is sufficient to give Everett, Cain, Melendez and Walters final policymaking authority.

The Supreme Court has never provided a clear answer to this question, but the plurality in *Praprotnik* did suggest that, although a bright line test may never be possible, "certain principles should provide useful guidance." *Id.* Specifically, "the authority to make . . . policy [binding on a government entity] is necessarily the authority to make final policy." *Praprotnik*, 485 U.S. at 127, 108 S. Ct. at 926. This leads to two requirements. First, a decisionmaker does not have final policymaking authority when his own decisions

are subject to the policies of a higher authority. "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the acts of the municipality." *Id.* Second, a decisionmaker does not have final policymaking authority when his or her decisions are subject to review. "[W]hen a subordinate's decision is subject to review by the [entity's] authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." *Id.; see Scala,* 116 F.3d at 1401 ("a[n] official does not have final policymaking authority when that official's decisions are subject to meaningful administrative review").

This latter test, which can be applied relatively easily, resolves the final policymaker issue in many cases. In the case at bar, however, it is difficult to conclude that any realistic review of the decision to search Story was even possible. Once she was searched, there was no going back to remedy a possibly bad decision. You can't unring a bell. Thus plaintiffs are correct in pointing out that Everett and the school officials had essentially the final decision over the way Miss Story was treated, and had significant discretion in making this decision.

However, these arguments ignore the other factor emphasized by the opinion in *Praprotnik.* The final policymaker inquiry cannot be collapsed into a question of whether higher decisionmakers had an opportunity to review and fix the problem. A meaningful opportunity for review will be missing in many tort-like situations. "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability." *Praprotnik,* 485 U.S. at 126-27, 108

60

S. Ct. at 926. Thus the fact that a government official made the final decision on a matter, and it was the wrong one, is not enough to impose liability under *Monell*. *See Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) (discussing the difference between authority to make a final decision and authority to establish policy). Instead, as *Praprotnik* makes clear, the proper inquiry is whether an official has the authority to make that decision according to his own guiding lights, or instead must bow to the policies set out by higher authorities. "The mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that *the subordinate's decisions are not constrained by official policies* and are not subject to review." *Scala*, 116 F.3d at 1399 (quoting *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989)) (emphasis added). If an official's decision is unfettered and final, he has final policymaking authority. If not, he has only discretion, and discretion alone is not enough to sustain liability.[25]

Applying these principles to the allegations of fact in the plaintiffs' complaint, this court concludes that neither Everett, Cain, Melendez nor Walters possessed final policymaking authority with respect to the student searches. As a matter of law, and on the basis of the plaintiffs' factual allegations concerning the existence of the Board's written

---

[25] The plurality in *Pembaur* offered this example:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. . . . Instead, if county employment policy were set by the Board of County commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner

*Pembaur*, 475 U.S. at 483 n.12.

61

student search policy, *Complaint* ¶ 67, Cain, Melendez and Walters could not have had *final* decisionmaking authority over their actions.  Indeed, the existence of the Board's express policy concerning student searches itself establishes that none of these three Board employees had final policymaking authority over student searches.[26]  *See Radic v. Chicago Transit Authority*, 73 F.3d 159, 161 (7th Cir. 1996) (no liability when "the decision to terminate Radic, [if] based upon his complaints, rather than upon his insubordination, . . . would have violated explicit CTA policy").  Likewise, though Everett was not subject to a policy with respect to this particular decision, she clearly could have been.  The City and the Sheriff can and surely do issue detailed policies controlling the procedures used by the law enforcement officers under their supervision.

The plaintiffs finally contend that the defendants involved in the search of Story had final policymaking authority because they were never disciplined for violations of the Board's policy.  The court is not convinced.  "Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy.  It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. . . . [T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority." *Praprotnik*, 485 U.S. at 130.

---

[26] The court notes that its conclusion agrees with that of a number of other courts which have been called on to assess the final policymaking authority of school principals in handling the security matters in their schools. *See, e.g., Eugene v. Alief Independent School District*, 65 F.3d 1299, 1304 (5th Cir. 1995) (although principal has "decision-making authority in certain areas," no final authority because "even in those areas the principal must follow the guidelines and policies established by the school district."); *Harless v. Darr*, 937 F. Supp. 1339 (S. D. Ind. 1996); *Oliver v. McClung*, 919 F. Supp. 1206 (N.D. Ind. 1995) (principal did not have final policymaking authority over strip search).

Even if the facts as alleged by the plaintiffs are taken as true, the court sees no basis for concluding that any of the officials involved in the investigation and search of Miss Story had final policymaking authority. As a result, the plaintiffs' section 1983 claims against the Board, the City, and the Sheriff based on their employees' alleged unconstitutional, discretionary acts before and during the search will be dismissed to the extent that they rely on final policymaking authority as a ground for liability. This includes claims based on the denial of Miss Story's right to call her mother.

### (d) Deliberate Indifference -- Board's Failure to Properly Train Employees.

The plaintiffs' only remaining method to establish liability under section 1983 for the acts of Everett, Cain, Melendez and Walters is to allege and prove that the failure of the City, the Board, and the Sheriff to enact an adequate policy or to train their employees amounts to deliberate indifference. The Supreme Court has held that "where [a local governmental entity's] failure to train [employees] reflects deliberate indifference to the constitutional rights of its inhabitants[,]" the local governmental entity may be sued under section 1983. *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). In *Canton*, the Court stated:

We hold today that the inadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [governmental employees] come into contact. This rule is most consistent with our admonition in *Monell*, 436 U.S., at 694, 98 S. Ct., at 2037, and *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S. Ct. 445, 454, 70 L. Ed. 2d 509 (1981), that a [local government] can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a [local government's] failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a

63

shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

*Canton*, 489 U.S. at 388-89.

The *Canton* Court also defined the circumstances under which a local governmental entity exhibits deliberate indifference:

[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [governmental entity] can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390.

The question before the Court, therefore, is whether the plaintiff has alleged facts, which, if true, would support the plaintiffs' claims that the Board's failure to promulgate a policy concerning searches of students amounts to a deliberate indifference to their constitutional rights, and whether the plaintiffs have stated a valid section 1983 claim for failing to provide an adequate policy[27] and proper training. At this stage, the court must view the facts in the light most favorable to the plaintiffs. According to the plaintiffs, Everett and the school officials strip searched her with little or no justification, and in an unconstitutional fashion. The policies the Board had in place provided little guidance on the proper time and manner for student searches, and Everett was operating in the absence of explicit guiding policies. It does not appear at this point that any of the defendants were given explicit training on how to evaluate the need for a student search, particularly a strip

---

[27] The Board claims that, as a matter of law, it cannot be held responsible for failure to promulgate a policy because it had policies in place. This does not negate the plaintiffs' claim that these policies were simply inadequate.

search. It may well be that their superiors knew that such instruction was needed, particularly if strip searches were regularly used or there had been prior complaints. If so, Everett, who was detailed to deal with youth crime, including in the school setting, and the school officials, who were directly responsible for discipline at the school, could be expected to  encounter situations where strip searches might be a possibility. All of these factual questions need to be explored further before this issue is fully and finally resolved.

The court is not suggesting that plaintiffs can necessarily meet the high standard of proof required by *Canton*. It simply cannot say at this point that they definitely cannot. Therefore the defendants' motion to dismiss will be denied as to the claims against the City, the Board and the Sheriff[28] based on the actions of Everett, Cain, Melendez, and Walters to the extent those claims are based on deliberately indifferent failure to train and promulgate policies, allegedly resulting in both an unconstitutional search and deprivations of Thompson's right to notification, allegedly protected under the constitutional right to privacy and family integrity. *See supra* at page 34.

### (2)   The Aftermath of The Search.

As noted above, *supra* at page 48, plaintiffs' allegations may make out a claim for invasion of the constitutional right to privacy based on the comments of defendants Merrill, Sexton, and perhaps Sellers to various representatives of the media. While it is not clear that a violation occurred, it is not clear that it didn't either. Immunity does not apply to claims against the entities Sellers, Sexton, and Merrill represent. Therefore, because

---

[28]For declaratory and injunctive relief only.

plaintiffs may be able to sustain these claims, the claims will survive at this stage. While the liability rules of *Monell*, *Pembaur*, and *Praprotnik* do apply, so that the plaintiffs must show that the speakers were final policymakers with regard to the comments at issue before liability will attach, the parties have not addressed this issue in any detail, and the court will not rule on it at this time. Therefore the defendants' motions to dismiss will be denied as to the claims against the Sheriff[29] and the Board based on violations of the plaintiffs' constitutional right to privacy during the alleged damage control campaign. None of the questionable incidents noted in the complaint involved Everett, the only City employee involved in this case, so to the extent that any similar claims have been pleaded against the City they will be dismissed.

## 2.    State Law Claims -- Sovereign Immunity.

Article I, § 14, Ala. Const. (1901), provides "[t]hat the State of Alabama shall not be made a defendant in any court of law or equity." This is the basis for the doctrine of sovereign immunity. "County boards of education, as local agencies of the State, enjoy this immunity." *Louviere v. Mobile County Bd. of Educ.*, 670 So. 2d 873, 877 (11th Cir. 1995); *see also Hill v. Allen*, 495 So. 2d 32 (Ala. 1986); *Hutt v. Etowah County Board of Education*, 454 So. 2d 973, 974 (Ala. 1984); *Clark v. Jefferson County Board of Education*, 410 So. 2d 23 (Ala. 1982); *Enterprise City Board of Education v. Miller*, 348 So. 2d 782, 783 (Ala. 1977); *Sims v. Etowah County Board of Education*, 337 So. 2d 1310 (Ala. 1976).[30]    The same

---

[29]For declaratory and injunctive relief only.

[30]These cases indicate that school boards partake of the state's immunity only to the extent the legislature wishes them to. Thus, where the creating statute for a board indicates that it "may be sued," courts have honored this legislative dictate and allowed suit. The statute under which county school boards are currently operating

66

protections extend to sheriffs when sued in their official capacity. *See Parker v. Amerson*, 519 So. 2d 442, 443 (Ala. 1987) (sheriffs are considered executive officers of the state, immune from suit under section 14).

The City is in a slightly different position. Its immunity has been set by the state legislature via statute. Section 11-47-190 of the Alabama Code provides that cities may be sued for certain claims resulting from negligence on the part of its agents. However, the statute immunizes cities from claims based on wantonness or intentional wrongdoing. *See, e.g., Scott v. City of Mountain Brook*, 602 So. 2d 893, 894-95 (Ala. 1992), *Hilliard v. City of Huntsville*, 585 So. 2d 889, 891 (Ala. 1991). However, the complaint appears to state only intentional tort claims against the City, so it should be protected by immunity as well.

Accordingly, all state law claims asserted by the plaintiffs against the City, the Board and against Sheriff Sexton in his official capacity will be dismissed.   This dismissal includes those state law claims asserted by the plaintiffs against the City's, the Board's, and the Sheriff's employees or agents in their official capacities.

## V.   CONCLUSION.

Accordingly, the various defendants' motions to dismiss will be granted in part and denied in part.   The Court will enter an appropriate order in conformity with this memorandum of opinion.

---

apparently omits this language, however. *See* Ala. Code § 16-8-40.

Done, this **16** of October, 1998.

_____

EDWIN L. NELSON

UNITED STATES DISTRICT JUDGE